IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


A.A.M.C. INC.,

       Plaintiff,

v.                                    CIVIL ACTION NO. 1:06CV101
                                      (Magistrate Judge John S. Kaull)

B.A.C. DISTRICT COUNCIL OF
WEST VIRGINIA BRICKLAYERS/
CEMENT MASONS LOCAL UNION NO. 15,

       Defendant.


## <u>MEMORANDUM OPINION AND ORDER</u>

This civil action was instituted by A.A.M.C., Inc. against B.A.C. District Council of WV

Bricklayers/Cement Masons Local Union No. 15 on June 26, 2006. Defendant filed its answer,

affirmative defenses and counterclaim on July 14, 2007. In the Report of Parties' Planning Meeting

[Docket Entry 10] the parties consented to trial before a United States Magistrate Judge without a

jury. By order dated September 19, 2007, the case was transferred to the undersigned Magistrate

Judge pursuant to the provisions of 28 U.S.C. §636 ( c ) and Rule 73 of the Federal Rules of Civil

Procedure. Pursuant to the final pre-trial order entered May 18, 2007 [Docket Entry 61], the matter

came on for trial to the Court on June 5 and 6, 2007. By Order dated June 6, 2007, a briefing

schedule was established, a transcript of the record was received, and the parties' written closing

arguments were received. Thereafter, the Court took the matter under advisement.

### Background of the Dispute

The case arises out of a dispute between Plaintiff, a minority contractor, and the Defendant,

a union, over Plaintiff's president/owner signing of a document entitled "Acceptance of Agreement"

on August 21, 2001.

Plaintiff is a general contractor performing various construction activities for both public and private entities. The company generally performs renovations as well as new construction. The company does construction jobs in Pennsylvania, Virginia, and Maryland as well as West Virginia. (Transcript 1, pp. 210)[1] The Plaintiff employs 25 to 30 full time employees but does subcontract some work. (Transcript 1, pp. 211)

The Defendant is a labor organization representing the interests of bricklayers and allied craftsmen in contract negotiations, organizing and the prosecution of grievances, among other things, for six local Bricklayer Unions. (Transcript 1 pp.24-25) The Defendant's area covers all 55 counties in West Virginia and three counties in Maryland. (Transcript 1 pp. 28)

Prior to August 21, 2001, the Plaintiff was engaged to perform a job at a cemetery located near Follansbee, West Virginia. The cemetery was owned by a company named Cornerstone. (Transcript 1, page 211) Originally the Plaintiff had employed five to six individuals to perform the masonry work on mausoleums at the cemetery. (Transcript 1, page 212) The Plaintiff was dissatisfied with the work being performed by these individuals which were provided to the Plaintiff by Mr. Ray Parr. (Transcript 1, page 70).

Rich Wilson, a field representative (Transcript 1, page 26) with the Bricklayers District Council, got a call from the District Office and was advised that there was brick work being performed at the cemetery in Follansbee. Mr. Wilson traveled to the job site and asked to speak to the company representative. He met with Mr. Duane Sayers, the job site supervisor for AAMC. (Transcript 1, page 160) Mr. Sayers said that he could not enter into any agreement with the Union

---

[1] The Court was provided with separate transcripts for the two days of trial. For ease of reference the transcript for June 5, 2007 will be referred to as Transcript 1 and the transcript for June 6, will be referred to as Transcript 2.

but that Mr. Wilson would have to speak to Mr. Alonso, the owner of AAMC. (Transcript 1, page 160) Wilson and Alonso talked on Sayers' cell phone. As a result of the phone conversation, Alonso and Wilson met at the Follansbee job site and Alonso signed a document entitled: "Acceptance of Agreement" after having reviewed a Collective Bargaining Agreement covering locals 1 and 11, both of which documents being presented to Alonso by Rich Wilson.

### Contentions of the Parties

Plaintiff contends:

1) There was no agreement between A.A.M.C. and the Union Local 15 because:

   A. There was no meeting of the minds and therefor no contract was formed when A.A.M.C.'s president signed the Acceptance of Agreement.

   B. Acceptance of Agreement should be voided under the Doctrine of Unilateral Mistake.

   C. Acceptance of Agreement is void because Wilson misrepresented what A.A.M.C.'s president was signing.

2) The Joint Arbitration Committee Award must be vacated because:

   A. The hearing was not fair.

   B. One member of the joint arbitration committee was partial toward the union inasmuch as he was the union's signer on the August 21, 2001 agreement.

3) Union's counterclaim fails for lack of proof of damages at trial.

Defendant contends:

1) The parties had a valid contract since it met all of the requirements as set out in law, including mutual assent manifested by the signing of the agreement and subsequent actions of the parties.

2)      By signing the agreement, the plaintiff agreed to submit to the grievance process.

3)      The fact that a request for a continuance was denied does not relieve the plaintiff from the consequences of the denial since it was the responsibility of counsel for the plaintiff to determine the status of the plaintiff's motion.

## Discussion and Analysis

**Agreement**

### Factual Analysis

Most of the facts in this case with respect to the execution of the Acceptance of Agreement document are undisputed.

A.A.M.C. is a general contracting construction company owned and operated by Robert Alonso. During the late summer of 2001, A.A.M.C. was building a mausoleum for the relocation of bodies displaced by a state road project involving Route 2 in the Follansbee/Weirton, West Virginia area. Tr. Vol. 1, p. 211-212.

Duane Sayers was the A.A.M.C. superintendent in charge of the Follansbee project. Tr. Vol. 1, p. 193. A.A.M.C. was not satisfied with the quality of the work of a block layer supplied by Ray Parr to lay split faced blocks. As a result, A.A.M.C. hired Danny Fultz to lay the blocks. Tr. Vol. 1, p. 195-196 and Tr. Vol. 1, p. 70.

As a result of information received that brick work was being performed at the cemetery in Follansbee, Rich Wilson of B.A.C. arrived on the A.A.M.C. Follansbee job site unannounced in August 2001. Tr. Vol. 1, p. 160, 195-196.

Rich Wilson was a field representative for the Bricklayers District Council of West Virginia[2]

---

[2]Bricklayers District Council covers all 55 counties in the State of West Virginia as well as Allegheny, Garrett and Washington Counties in Western Maryland and is comprised of six locals. Locals 1 and 11 are located in Wheeling and Weirton, West Virginia respectively. Tr. Vol. 1, p. 29-31.

for 15 years. Tr. Vol. 1, p. 131. As such, his job duties in 2001 included: "referring bricklayers out to work if a contractor calls;" working with shop stewards on each job "to make sure that the bargaining agreement is being adhered to;" and working through the shop stewards to closely watch safety. As organizer, Wilson described his role as one who has "signed on hundreds of contractors" "over all those years." Tr. Vol. 1, p. 132. As a field representative, Wilson was "authorized to negotiate and enter into a contract with the Union, for - - for - - on behalf of the Union with a contractor." Tr. Vol. 1, p. 26, 27 and 132. Wilson had authority to make representations to a contractor and by his representations he could bind the union. Tr. Vol.1, p. 64. His primary "core of influence or sphere of influence [was] the Northern Panhandle of West Virginia and also the mid - - mid - Ohio Valley area" Tr. Vol. 1, p. 132. This is the same "six most northern counties" of West Virginia which are covered by the CBA (collective bargaining agreement) which governs Locals 1 and 11 of the Bricklayers District Council. Tr. Vol. 1, p. 134.

In his role as union organizer, Wilson described his method [mode] of operation as:

1.      "Make the contact."

2.      "If they wanted to look and read an agreement, we'd get the one from where they were - - from where that job would be."

3.      "I would have them sign the statewide acceptance of agreement." Tr. Vol. 1, p. 134.

Significant factual dispute exists over the events that led to Wilson going to the Follansbee job site in August 2001.

Wilson says he believed he got a call from Leroy Hunter of the District Council office, telling him "He had heard there was a job up there that might need bricklayers." He testified "[t]here was a problem with the guys that were laying the block up there or whatever. That's when

I went up. I was directed to go up there, and I did." Tr. Vol. 1, p. 160.[3]

Leroy Hunter, six year director of the B.A.C. District Council of West Virginia, testified he had two conversations with Robert Alonso prior to Alonso's signing of the Statewide Acceptance of Agreement in August 2001. Hunter claims Alonso first called him and they talked about signing a Statewide Acceptance of Agreement.

According to Hunter, the first conversation occurred when Alonso called Steve Montoney at the ACT Foundation seeking masons who could lay stone. Hunter recollects Montoney handing the phone over to him and he and Alonso then talking about getting bricklayers because he had trouble with the block layers supplied by Ray Parr. Hunter testified: "Mr. Wilson hadn't met yet when Mr. Alonso and I were discussing the contract" and therefore Alonso would not have had a copy of the contract or any contract in front of him as they spoke. Tr. Vol.1, p. 68. Hunter also claims he and Alonso spoke a second time but that the conversation involved "getting competent bricklayers to his project." Tr. Vol. 1, p. 72.

Although Hunter receives literally hundreds of yearly calls from contractors which he does not remember from day to day and although Hunter has no records of the August 2001 conversations with Alonso, he claims to recall them because:

"prior to that, that, Mr. Alonso had, through Mr. Montoney, had looked at different jobs that involved masonry, bricklaying, block laying. And at that time, after their discussion, Mr. Montoney would call me and make reference to that, you know, Mr. Alonso was looking at such and such job, he would be interested in, you know, getting a few bricklayers from you, but he's not going to sign your statewide

---

[3]This is inconsistent with Wilson's own trial testimony that he went to the A.A.M.C. job site, met with Sayers and only after that meeting got a call from Hunter to go to the site to meet with Alonso. Tr. Vol. 1, p. 63, 150, 152.

agreement.  And - - or he would look at a job, if I get this job I want to - - I want to

talk to the bricklayers this time.  There was references made throughout time about

that.  And so, it was always, it was an ongoing thing and - - and other contractors, I

guess, have the same approach.  They want to use what's good about the union for

their benefit and then throw it away when they don't need us.  So, a contractor of that

type sticks in my mind more that others.  This particular time that, you know, when

he called, it was the same approach.  He knew the history, but again he tried for, you

know, to use us to get himself out of a bind, but then the Union, he had no use for us

after that.  So again, because of the history, I had heard the same story for a number

of years.  That's why it was just, it was just an ongoing scenario with Mr. Alonso."

[4] Tr. Vol. 1, p. 114-115. Tr. Vol. 1, p. 66-67.

Steven Warren Montoney, employed by West Virginia Appalachian Labors District Council

and a former long term member of the bricklayers union,  testified he was not at the ACT

Foundation in August 2001 when the alleged phone call from Alonso was made. Tr. Vol. 2, p.71-

75.  Montoney says  he had  a number of calls with Alonso over the years and does not recall

specifics.  He says he remembered the first one[5] because he "was pretty excited about getting him

hooked up with the bricklayers."  He remembers being at a meeting with Leroy Hunter when the call

came in from Alonso but he does not know where the meeting took place or what the purpose of the

meeting was.  He does not even remember the year of the meeting.  He remembers the call was about

laying stone but he does not recall the particulars as to size and type of stone.  Tr. Vol. 2, p.  75-83.

[4]This testimony is inconsistent with other testimony that Hunter provided which indicated that the call that led to the August 21, 2001 agreement was the first call and that Alonso had no prior dealing with the Union.

[5]If it was the first conversation during which Montoney got excited about "hooking Alonso up with the bricklayers" then Hunter's recollection of a history of calls between Montoney and Alonso leading up to him hooking Alonso up with the bricklayers is incorrect.

Even though Montoney thought the call from Alonso involved "somebody to do some stone work [in a mausoleum]" and thought it was "in the Wheeling area or up in that northern - - western West Virginia," Alonso as well as his superintendent testified the Follansbee mausoleum job involved laying of split face block and no stone work. Tr. Vol. 2, p. 73 and Tr. Vol. 1, p. 195-196.

Alonso denies talking to Hunter prior to 2003. Tr. Vol. 1, p. 219. In addition, Sayers testified that they had a competent brick layer on the job notwithstanding that Ray Parr had earlier been ineffective and less competent in that position.

According to Sayers the only stone mason work A.A.M.C. was involved with was the Federal Courthouse remodeling project on which he was superintendent in February and March 2003. On that project they hired union stone masons to put up a limestone face on the front of the building. Tr. Vol. 1, p. 201. Alonso confirms having called Montoney in February 2003 seeking information Montoney may have had about stone masons from the Elkins, West Virginia area. Tr. Vol. 1, p. 221. Alonso knew and Montoney's testimony confirms that he [Montoney] was from the Elkins [Harmon], West Virginia area and may have knowledge of stone masons in the area.

As a result of that conversation, in March 2003 Hunter sent two stone masons to work on the Martinsburg Federal Courthouse project. Tr. Vol.1, p. 221. Alonso and Hunter deny any conversation about the Union already having a contract with A.A.M.C. Tr. Vol. 1, p. 223. Hunter admits having a conversation and sending stone masons from the bricklayers to the Martinsburg project. However, he denies the conversation was with Robert Alonso. Tr. Vol. 1, p. 60. He testified it was with Alonso's son, Todd. Tr. Vol. 2, p. 84.

Todd Alonso testified he was not the project manager on the Martinsburg job. He testified George Stewart was and that Stewart was ordered off the project by GSA and was replaced by David

Glendenning. Todd Alonso states he did not have any conversations with Hunter during the Martinsburg job. Tr. Vol. 2, p. 157-159.

Hunter finally testified he would not have sent any bricklayers to the Martinsburg project unless a contract had already been signed by A.A.M.C. as proof of the existence of the contract. Tr. Vol. 2, p. 85.[6]

Based on the foregoing testimony, having considered the demeanor of the witnesses, the opportunity for the witnesses to know and their statements of their recollections and lack of recollection, their lack of records for use in refreshing their recollections, their interest or lack of interest in the outcome of the within litigation, their candor and credibility, the Court finds Hunter's testimony that the conversations with Alonso took place in August 2001, prior to and incident to Wilson going to the Follansbee site and that those conversations involved job to job agreements and the union policy against the same or its requirement that contractors sign on to a statewide acceptance of agreements, not credible.

Instead, the Court finds by a preponderance of the credible evidence that:

1)    Alonso's conversation with Montoney and Hunter took place during 2003[7].

---

[6]While Hunter and the union may have believed they had a contract with A.A.M.C. that covered the Martinsburg 2003 project, the fact that they held that belief and sent bricklayers does nothing to prove that Alonso had a belief that he had a contract with the union that covered the Martinsburg job. The evidence is clear that Alonso believed he had a job agreement in August 2001 that covered the Follansbee project.

[7] Montoney has no recollection of when he talked with Alonso. Montoney was not with the ACT Foundation in August 2001. Montoney remembers he was with Hunter at a meeting when the call came in but not where the meeting took place or what it was about. Montoney remembers the conversation being about stone masons to lay some kind of stone. The stone project was to the 2003 Federal Courthouse project in Martinsburg. The Follansbee project involved laying split faced block, not stone. Hunter claimed his conversations about stone masons at the Martinsburg Federal Courthouse project were with Todd Alonso when Todd Alonso testified he was not the project manager on the Courthouse project and did not have any conversations with Hunter during the Martinsburg job. Robert Alonso's sole reason for calling Montoney was because Alonso knew Montoney lived in the Elkins area and might know some stone masons Alonso could use on the Martinsburg project.

2)   Hunter's conversation in 2003 did not involve the Follansbee, West Virginia project . It did involve the use of skilled stonemasons to lay up limestone on the face of the Federal Courthouse in Martinsburg, West Virginia.

3)   No substantive conversations concerning the Follansbee project took place between Alonso and Hunter prior to 2003.

4)   Conversations involving use of bricklayers did occur between Alonso and Montoney over a period of time but that period of time is not known or defined by Montoney.

5)   There were no discussions between Alonso and Hunter prior to 2003 concerning job to job agreements and the union policy against the same or its requirement that contractors sign on to a statewide acceptance of agreements.

There is no dispute that Wilson went to the Follansbee project in August 2001and met with the job superintendent  to get A.A.M.C. signed to a union contract.  Wilson says he was at the job site twice.  He says the first time he went and met with Sayers,  the superintendent.  While he admits that Sayers told him he would have to speak with Alonso because Sayers did not have authority to sign the company to a union contract [Tr. Vol. 1, p. 197], Wilson does not recollect whether he threatened to picket the job if the company did not sign and use union bricklayers. Tr. Vol. 1, p. 150. Sayers testified Wilson arrived unannounced and threatened to picket the job site unless union bricklayers were used.  Tr. Vol. 1, p. 196.[8]  Sayers further testified and Wilson does not dispute that, after Sayers told Wilson he had no authority to sign a contract and that Wilson would have to talk with Alonso, he [Sayers] called Alonso on a cell phone and connected Wilson with Alonso.  Tr. Vol. 1, p. 197.

---

[8]Whether a threat to picket was expressly made or implied, it is apparent that Sayers believed a threat to picket the work site had been made and acted accordingly by telling his employer, Alonso.  Alonso also believed a threat to picket the job had been made by the union should he not use union bricklayers.

Sayers testified and Wilson does not dispute that Wilson and Alonso did meet on the job site the next day or a couple of days later. Tr. Vol. 1, p. 199. Wilson confirms that he was told by Hunter to go to the job site to meet with Alonso[9]. Tr. Vol. 1, p. 63, 150, 152 . Wilson confirms the meeting with Alonso was within a couple of days of his first meeting with Sayers: "I'd say it was the day after. Not the day that I met Mr. Sayer, not the day after, but the one after that is probably the best of my recollection." Tr. Vol. 1, p. 151-152. Alonso testified he met with Wilson at the job site, received a copy of the contract governing locals 1 and 11 [Plaintiff's Exhibit 1] and took it home to review. Tr. Vol. 1, p. 214. Wilson's testimony confirms that it was his standard mode of operation to provide the prospective signatory to the CBA with a copy of the agreement governing the area where the work was then being done. In this case Wilson says he would have given Alonso a copy of the collective bargaining agreement that governed locals 1 and 11 since that is the agreement which covered the Northern Panhandle area of West Virginia. Tr. Vol.1, p. 139-140. Notwithstanding his standard mode of operation and his testimony that he does not have a specific recollection of anything he said to Alonso during the meetings, and particularly the meeting of August 21, 2001, Wilson denies he gave Alonso a copy of the CBA for locals 1 and 11 to take home and review stating that: "[W]e had the job meeting there and he went through the agreement. He went through the agreement at that time and signed it on the 21st." "He [Alonso] looked through the thing. ... He looked through the whole thing." Tr. Vol. 1, p. 149. It is this type of selective memory of events that also renders Wilson's testimony suspect.

Alonso went back to the job site on a Monday or a Tuesday and again met with Wilson. Alonso told Wilson he wanted a job-to-job agreement. Wilson handed Alonso a single white piece

---

[9]If Hunter had already talked to Alonso and had discussed the signing of a statewide agreement and the denial of a job to job agreement, Wilson would have gone to the first meeting with Alonso armed with the statewide agreement for Alonso to sign. Instead, he gave Alonso Plaintiff's Exhibit 1, the CBA for locals 1 and 11, to review.

of paper and " told him that it was the same reading which I [Alonso] took it to mean that it was the same content and he give me a white agreement and – and I did not read it, I signed it." Alonso said: "Wilson gave him 'just one single sheet of paper.' And he said, 'That it had the same content.' He said, his words, 'the same thing as the last paragraph as this collective bargaining agreement." Alonso testified that Wilson told him that "what I was signing was the exact same material that was in the last page of the Collective Bargaining Agreement. And I took the man at his word and I signed it." Tr. Vol. 1, p. 239.

While Wilson admits Alonso had the collective bargaining agreement for locals 1 and 11 to look through at the vehicles, he testified he did not show or go over any of the other agreements covering areas where A.A.M.C. was not working at the time because: "No, because like I stated before, it's whatever one they start at, that's the one we go through because we can't go through all 60 of the agreements." Tr. Vol. 1, p. 140. Wilson specifically testified he would not have brought a copy of the agreement covering local 15 [Plaintiff's Exhibit 10] because the job was not in the area covered by Local 15. Tr. Vol. 1, p. 141. Wilson gives no explanation why he would not have given Alonso a copy of the "Acceptance of Agreement" to review particularly if that is the agreement Wilson was going to insist be signed. However, whether Plaintiff's Exhibit 1 was provided to Alonso to review over a weekend or on the morning of the 21st, it is undisputed that the "Acceptance of Agreement" was not handed to Alonso by Wilson at the same time as Plaintiff's Exhibit 1. Wilson also testified that he tells people when they sign the Acceptance of Agreement that "they pretty much mirror each other." "They're basically the same language except for a few minor differences" "it mirrors the rest of them .... or almost identical in language. And in my mind they are." Tr. Vol. 1, p. 144. Later referring to what he told Alonso on the 21st, Wilson testified: "Yeah, sign this, this is the statewide - - here's the language before you even look through the thing,

here's the language. Okay. Then it's always, okay, once you are familiar with that language, you sign on to the statewide acceptance of agreement I call it. You guys call it statewide agreement." And with the understanding that they're nearly identical in terms, the others? Yeah, almost identical. In my mind they are." Tr. Vol. 1, p. 153- 154. When asked if he could remember what he specifically told Alonso about the Acceptance of Agreement, Wilson could not remember. He could not say he told Alonso that the agreement was "statewide agreement" or "statewide acceptance of agreement" because he was not positive he said that even though it was his normal mode of operation to do so. Tr. Vol. 1, p. 137. With respect to whether Wilson told Alonso that there were significant differences in the Acceptance of Agreement and in the local agreement governing locals 1 and 11, Wilson indicated that in his mind, there were not significant differences. Tr. Vol. 1, p. 158.

Alonso testified that he was prepared to sign the "blue agreement" [ Plaintiff's Exhibit 1-the agreement that governed locals 1 and 11] when Wilson handed him the white single sheet of paper and told him to sign it instead. Wilson has no recollection of this but testified: "Oh, I'd have a reason to dispute the fact that I - - I told him not to sign the blue one. I don't care if he signs it or not as long as he signs the Acceptance of Agreement, which is our procedure. I mean, he could have signed the blue one, but as long as he signs that Acceptance of Agreement, in our mind - - in our mind, he's signing the - - all the bargaining agreements."

Counsel then asked Wilson: "But do you point that out? Do you say wait a minute, there are significant differences between that document, particularly when Mr. Alonso testify - - will testify that he was going to sign it, there's significant differences between these two documents?"

Wilson first responded: "The Acceptance of Agreement and the local agreement?"

Counsel: "Yes"

Wilson responded: "Not in my mind there's not." Tr. Vol. 1, p. 158.

Based on the foregoing, the Court finds by a preponderance of the credible evidence and concludes that:

1) Wilson met with Sayers at the Follansbee job site and threatened to picket the job site if union workers were not used.

2) Sayers called Alonso on a cell phone from the job site because he did not have authority to sign A.A.M.C. to a union contract.

3) During the cell phone call, Alonso and Wilson agreed to meet at the work site.

4) Alonso received and over the weekend reviewed a copy of Exhibit 1, the CBA for locals 1 and 11 which covered the Northern Panhandle area of West Virginia.

5) Alonso and Wilson met on Tuesday, August 21, 2001 at which time:

    a. Alonso asked for a job to job agreement;

    b. Alonso was ready and willing to sign Exhibit 1;

    c. As Alonso was prepared to sign Exhibit 1, Wilson handed Alonso a single white sheet of paper entitled "Acceptance of Agreement";

    d. Wilson told Alonso that the Acceptance of Agreement was the same as the signature page in Exhibit 1, the CBA for Locals 1 and 11 and that he was to sign the white sheet of paper (Acceptance of Agreement);

    e. Wilson did not disclose to Alonso that there were significant differences between the signature page in the CBA for Locals 1 and 11 and the Acceptance of Agreement either because he did not know and understand the significance of the differences that did exist or because he did not want to disclose those differences.

    f. Wilson's misrepresentation of the Acceptance of Agreement to Alonso was material

in that the Acceptance of Agreement contained language that bound Alonso's A.A.M.C. to all CBA's for all the locals in West Virginia as opposed to a single CBA for the Northern Panhandle (Locals 1 and 11).

g.   The Acceptance of Agreement document (Exhibit 2) is misleading on its face in that its title  (Acceptance of Agreement) implies acceptance of a single agreement which is contrary to the language contained in smaller print within the body of the document.

**Duty to Read**

"A person who fails to read a document to which he places his signature does so at his peril." Reddy v. Community Health Foundation of Man, 171 W.Va. 368, 298 S.E.2d 906 (W.Va.,1982).

In the case of Hoffman v. National Equipment Rental, Ltd., 643 F.2d 987 (C.A.W.Va., 1981), Hoffman, in an attempt to avoid his lease of 21 dairy cows, contended that he was ignorant of the contract's provisions when he signed the lease. However, the Court found: " no one deterred him from getting his glasses and reading the contract, or from seeking desired explanation from Rusk or from his wife who had already signed. Ignorance due to failure to read is no excuse in New York, Amend v. Hurley, 293 N.Y. 587, 59 N.E.2d 416 (1944); Pimpinello v. Swift & Co., 253 N.Y. 159, 170 N.E. 530 (1930); Dambmann v. Schulting, 75 N.Y. 55 (1878), or in West Virginia, R. D. Johnson Milling Co. v. Read, 76 W.Va. 557, 85 S.E. 726 (1915); Acme Food Co. v. Older, 64 W.Va. 255, 61 S.E. 235 (1908).[FN3] No deception was present to dilute the rigor of this doctrine."

In the early West Virginia case of Hale v. Hale, 62 W.Va. 609, 59 S.E. 1056 (W.Va. 1907), "[a] husband, having a contingent estate by the curtesy in his wife's lands, who, for several years, has been in the habit of executing deeds, prepared by his son, conveying small town lots out of the same, without reading them, on the representation of the son as to what was conveyed and to whom,

in each case," sought to set " aside, as having been fraudulently procured, a deed so prepared conveying to the son all of the wife's real estate, in consideration of $1 and natural love and affection, and executed by him, without reading it, on the son's representation that it conveys a mere town lot." In setting aside the deed, the <u>Hale</u> Court held: "[F]ailure to read an instrument, before signing it, does not bar relief therefrom in equity, on the ground of negligence or estoppel, when the circumstances attending the transaction were such as to lead the party to believe he was signing a paper of entirely different character.... When, in a suit by the grantor in a deed to set it aside for fraud in the procurement thereof, the oral evidence of the parties relating directly to the execution thereof if flatly contradictory and wholly irreconcilable, the circumstances bearing on the issue must be allowed unusual prominence and effect, and their controlling force depends more upon their character and power to create mental impression than their number and variety...." However, the Court clearly indicated: "Mere failure to read a deed or other instrument before signing it, by a person who is able to read and understand it, being only negligence of the injured party, not importing fraudulent conduct on the part of him who obtains the benefit of it, is not ground for setting the instrument aside. Equity never relieves a party from his own deliberate acts, done with full knowledge of the facts."

Alonso admits he failed to read the Acceptance of Agreement before he signed it. He testified that it was not unusual for him to sign single sheets of paper with respect to job-to-job agreements. There is no evidence that Wilson prevented Alonso from reading the agreement or even told him not to read it. Alonso said Wilson had two of the white pieces of paper and he signed both in blue ink keeping one for himself and giving one to Wilson. Tr. Vol. 1, p. 215-218, 239. He placed his copy of the signed Acceptance of Agreement inside the Local 1 and 11 Agreement he had been given by Wilson and filed it in his office file for union paperwork and agreements. Tr. Vol.

1, p. 215.

The "Acceptance of Agreement" [Plaintiff's Exhibit 2] was signed by Wilson in behalf of the union and by Alonso in behalf of A.A.M.C. on the hood or tailgate of a truck on August 21, 2001. Tr. Vol. 1, p. 140. The Court takes judicial notice that August 21, 2001 fell on a Tuesday.

Based on the foregoing, a preponderance of the evidence establishes that Wilson met with Sayers; then met with Alonso a day later and gave Alonso Plaintiff's Exhibit 1, the CBA for locals 1 and 11; that nothing took place over the weekend; and the two again met on the following Tuesday, August 21, 2001, when the Acceptance of Agreement [Plaintiff's Exhibit 2] was signed.

**Material Misrepresentation**

While Wilson's mode of operation was to refer to Plaintiff's Exhibit 2 as "Statewide Acceptance of Agreement," there is no evidence that he used such a term in talking with Alonso about the agreement and the actual title of the document is "Acceptance of Agreement."[10] In the instant case, the handing of Plaintiff's Exhibit 2 [Acceptance of Agreement] from Wilson to Alonso as Alonso was ready to sign the signature page of Plaintiff's Exhibit 1; the representation of Wilson to Alonso that the Acceptance of Agreement was the same as the signature page of Plaintiff's Exhibit 1; and the title of the document signed "Acceptance of Agreement" being in the singular instead of plural, taken in totality, constitute a misrepresentation of material facts with respect to the document being signed which dilutes the rigor of the doctrine that one who fails to read does so at his peril.

**Fraudulent Inducement**

The next step of the required analysis is a determination whether the misrepresentation of

---

[10]It is significant to the Court that while the body of Plaintiff's Exhibit 2 portends to be an acceptance of multiple "current and any subsequent approved labor agreements", the title of the document is conspicuously singular, to wit: Acceptance of Agreement.

fact by Wilson was fraudulent or merely negligent. "Where one person induces another to enter into a contract by false representations which he is in a situation to know, and which it is his duty to know, are untrue, he, in contemplation of law, does know the statements to be untrue, and consequently they are held to be fraudulent, and the person injured has a remedy for the loss sustained by an action for damages. It is not indispensable to a recovery that the Defendant actually knew them to be false." Horton v. Tyree, 104 W.Va. 238, 139 S.E. 737 (1927) and cited in Kidd v. Mull, 215 W.Va. 151, 595 S.E.2d 308 (2004).

"One to whom a representation has been made as an inducement to enter into a contract has a right to rely upon it as true quoad the maker, without making inquiry or investigation to determine the truth thereof." Staker v. Reese, 82 W.Va. 764, 97 S.E. 641 (1918) and cited in Kidd v. Mull, *supra.*

While the true motive of Wilson may never be known, the evidence is clear that his mission was to obtain Alonso's signature on the Acceptance of Agreement thereby binding Alonso and his company A.A.M.C. to all of the bricklayers' collective bargaining agreements in the State of West Virginia. The evidence is clear that Wilson gave Alonso the CBA for locals 1 and 11 covering the area of the Northern Panhandle of West Virginia, the area where Alonzo's company was performing the Follansbee project. The evidence is clear that Alonso had asked Wilson for a job to job agreement and that he had reviewed and was prepared to sign the signature page to the CBA for locals 1 and 11. The evidence is clear that Wilson then handed Alonso a document not shown to him before and told Alonso to sign it. The evidence is clear that Wilson had an opportunity to know and did know the document he gave to Alonso constituted an acceptance of all of the bricklayer CBA's throughout the State of West Virginia and not just locals 1 and 11. Wilson knew or had reason to know the document he gave to Alonso to sign was misleading in that its title, as prepared by the

Union, was in the singular and not the plural. Yet, Wilson did not tell Alonso of the true nature of the Acceptance of the Agreement document but instead told Alonso it was the same as the signature page to Plaintiff's Exhibit 1 that Alonso had been ready to sign.

Pursuant to Section 153 of the Restatement (Second) of Contracts:

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 144, and (b) the other party had reason to know of the mistake or his fault caused the mistake.

Pursuant to Section 163 of the Restatement (Second) of Contracts:

(1) If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.

(2) If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction.

By way of example the Restatement (Second) of Contracts provides:

A and B agree that A will buy a tract of land from B for $100,000 and will assume an existing mortgage of $50,000. In reducing the agreement to writing, A intentionally omits the provision for assumption but tells B that the writing correctly expresses their agreement. B does not notice the omission and is induced by A's statement to sign the writing. The misrepresentation is both fraudulent and material, and the contract is voidable by B.

Accordingly, the Court concludes that Wilson's handing of the Acceptance of Agreement to Alonso and his representation that it was the same as the signature page of the CBA for locals 1 and 11 when it was not, constituted a fraudulent misrepresentation of a material fact designed to induce Alonso to sign it accepting all of the CBA's in West Virginia when Alonso believed he was only signing the CBA for locals 1 and 11 which covered the area in which he was then working.

Section 163 of the Restatement (Second) of Contracts. Even if the representations of Wilson leading up to and at the time of Alonso's execution of the Acceptance of Agreement did not rise to the level of fraud, but were mistakenly made instead, the representation made went to the basic assumption underlying the agreement, that the page being signed was the same as the signature page of the CBA governing Locals 1 and 11 and that by signing it Alonso was only binding himself to a deal with Locals 1 and 11. Since the representation was being made by Wilson, Alonso does not bear the fault for the mistake. In either case, the contract is voidable by A.A.M.C.

Accordingly, the Court concludes that no contract can be said to have existed between the Union and A.A.M.C. In the absence of a contract, A.A.M.C. is not bound by the collective bargaining provisions applicable to Local 15 which would have governed the Morgantown project. Similarly, absent a contract, A.A.M.C. is not bound by the dispute resolution procedures established in the CBA for Local 15 nor to the results of the dispute resolution procedures.[11]

## Judgment and Order

It is therefore Adjudged and Ordered that Plaintiff, A.A.M.C., have Judgment against Defendant, B.A.C. District Council of WV Bricklayers/Cement Masons Local Union 15; Defendant's counterclaim and damages claim made therein be and the same is hereby Denied; the Acceptance of Agreement signed by Alonso in behalf of A.A.M.C. on August 21, 2001 be and the same is hereby avoided, set aside and held for naught; and the decision[12] of the Joint Arbitration

---

[11] The Court need not and does not address the remaining issues raised herein with respect to the contract or the dispute resolution process.

[12] Had the Court been required to proceed to a decision on the merits of the Joint Arbitration Committee hearing and decision, the Court would note that the union violated its own rule by not holding the hearing within the four (4) calendar days (excluding weekends and holidays) it said was required. Plaintiff's Exhibit 10, p. 10 and 12. Instead it was held on the 5th day, one day late. Hunter requested the hearing on May 17, 2006, a Wednesday. Tr. Vol. 2, p. 31. The hearing was held Wednesday, May 24, 2006. Union argued at trial that it was timely because the Memorial Day weekend intervened between the request and the hearing. The Court takes judicial notice that Memorial Day 2006 was Monday, May 29, 2006. Accordingly, union's

Committee is vacated, set aside and held for naught. It is further Adjudged and Ordered that Plaintiff's Motion For Summary Judgment (Docket Entry 52) be and the same is **Denied as having been rendered Moot** by the within order. It is further Adjudged and Ordered that Plaintiff's oral trial motion to strike Defendant's counterclaim and damages claim is **Denied as having been rendered Moot** by the within order.

The Clerk of Court is directed to enter a separate judgment order. Fed. R. Civ. P. 58.

The Clerk of the United States Court for the Northern District of West Virginia is directed to provide a true copy of this order to all counsel of record.

DATED: November 30, 2007

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

---

argument that the holiday extended the time limit by one day is misplaced. The fact that the union did not hold the hearing within the time limits it insisted on, further erodes its reasoning for not granting A.A.M.C the continuance it requested in order for its counsel to participate. In addition, the Court would have had to scrutinize the propriety of Wilson serving as a decision maker and member of the Joint Arbitration Committee when he knew he was the person who represented the union at the signing of the Acceptance of Agreement.